

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

**F I L E D**

**MAY 22 2018**

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

| | |
|---|---|
| (1) WESLEY PRINCE, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| (2) BOARD OF COUNTY COMMISSIONERS | ) |
| FOR THE COUNTY OF TULSA, | ) |
| (3) VIC REGALADO, in his official capacity | ) |
| as Sheriff of Tulsa, County, Okla., | ) |
| (4) CITY OF TULSA, | ) |
| (5) STEPHEN TIDWELL, TPD Officer, | ) |
| (6) TURN KEY HEALTH CLINICS, LLC, | ) |
| (7) FLINT JUNOD, in his individual capacity, | ) |
| (8) JESSE WHITE, in his individual capacity, | ) |
| (9) WILLIAM COOPER, in his individual capacity,) |  |
| (10) JANE KIRBY, in her individual capacity, | ) |
| (11) JON ECHOLS, in his individual capacity, | ) |
| (12) TRENT SMITH, in his individual capacity, | ) |
| (13) CINDY BILYEU, in her individual capacity, | ) |
| (14) NICOLE COBB, in her individual capacity, | ) |
| (15) TAMERA JACKSON, in her individual | ) |
| capacity, | ) |
| (16) DANNY HICKMAN, in his individual | ) |
| capacity, | ) |
| (17) RHETT BURNETT, in his individual | ) |
| capacity, | ) |
| | ) |
| Defendants. | ) |

**18 CV   282 CVE - JFJ**

Case No.

### NOTICE OF REMOVAL

Defendant Board of County Commissioners for the County of Tulsa ("BOCC"), by and through their undersigned counsel, pursuant to 28 U.S.C. §§ 1331, 1441 and 1446, hereby notify this Court that they are removing the above-captioned action currently pending in the District Court of Tulsa County, Oklahoma to the United States District Court for the Northern District of Oklahoma. In support of this Notice of Removal, Defendants state as follows:



1.     Plaintiff filed their Petition against Defendants in the District Court for Tulsa County, Oklahoma, on December 11, 2017 (the "State Court Lawsuit").   Defendant BOCC received service of Plaintiff's Petition on or about May 4, 2018.  Thus, this Notice of Removal is filed with this Court within thirty (30) days of the receipt of Plaintiff's' Complaint (or Petition) as required by 28 U.S.C. § 1446(b).

2.     Other than Defendant Vic Regalado, no other defendants are known to be served at this time.  Defendant Regalado consents to the removal of this action.

3.     Defendant BOCC is filing a Status Report of Removed Action along with the filing of this Notice of Removal.  It is currently expected that, within seven (7) days of filing this Notice of Removal, Defendants will also be filing its motion requesting an additional twenty (20) days to file an answer or other responsive pleading.  Pursuant to LCvR 81.2, clear and legible copies of all documents filed or served in the case are attached as follows: Plaintiff's Petition as Exhibit "1", a copy of the summons served upon Defendant BOCC as Exhibit "2", a copy of the Ex Parte Motion for Substitution of Parties as Exhibit "3", a copy of Judge Nightingale's Order dated March 16, 2018 as Exhibit "4", and a copy of the Docket Sheet as Exhibit "5."

4.     The basis for removal to federal court is federal question jurisdiction pursuant to 28 U.S.C. § 1331.

5.     In accordance with 28 U.S.C. § 1446(d), Defendant BOCC is promptly filing a copy of this Notice of Removal with the Clerk of the District Court for Tulsa County, Oklahoma.

6.     In accordance with 28 U.S.C. § 1446(d), Defendant BOCC is also giving written notice to Plaintiff by promptly serving this Notice of Removal upon Plaintiff's counsel.

7.     As required by 28 U.S.C. § 1441, Defendant BOCC seeks to remove this case to the United States District Court for the Northern District of Oklahoma, which is the District Court embracing the place where the State Court Lawsuit has been filed.

## FEDERAL QUESTION JURISDICTION

8.     Plaintiff's Petition makes claims under 42 U.S.C. § 1983.  See Plaintiff's Petition, Exhibit "1."

9.     Accordingly, Plaintiff has invoked this Court's original jurisdiction on "a claim or right arising under the Constitution, treaties or laws of the United States."  28 U.S.C. §§ 1331 and 1441.

10.     Venue lies in this Court because Plaintiff's action is pending in this district and division.  See 28 U.S.C. § 1441(a).

WHEREFORE, Defendant BOCC respectfully requests that the above-captioned action now pending in the District Court of Tulsa County, Oklahoma, be removed to the District Court for the Northern District of Oklahoma, and that said District Court assume jurisdiction of this action and enter such other and further orders as may be necessary to accomplish the requested removal and promote the ends of justice.

Dated this 22nd day of May, 2018.

Respectfully submitted,

Kim M. Hall
OK Bar Number 16100
Assistant District Attorney
Tulsa County District Attorney's Office
500 S. Denver Ave., Suite 827
Tulsa, OK 74103

khall@tulsacounty.org
(918) 596-4845
ATTORNEY FOR DEFENDANT BOARD OF
COUNTY COMMISSIONERS FOR THE
COUNTY OF TULSA

## CERTIFICATE OF MAILING

I hereby certify that on this 22nd day of May, 2018, I caused a true and correct copy of this document to be placed in the United States mail, first class postage fully pre-paid, addressed to:

Hunter M. Siex
J. Spencer Bryan
Steven J. Terrill
Bryan & Terrill Law, PLLC
9 East 4th Street, Suite 307
Tulsa, OK 74103

Kim M. Hall



# IN THE DISTRICT COURT FOR TULSA COUNTY
## STATE OF OKLAHOMA

(1)    WESLEY PRINCE,

               Plaintiff,

v.

Case No.: _____

## CJ-2017-04900



REBECCA NIGHTINGALE

(2)    BOARD OF COUNTY
       COMMISSIONERS FOR THE
       COUNTY OF TULSA,

(3)    VIC REGALADO, in his official
       Capacity as Sheriff of Tulsa
       County, Okla.,

(4)    CITY OF TULSA,

(5)    JOHN DOE, TPD officer,

(6)    TURN KEY HEALTH
       CLINICS, LLC,

7)     FLINT JUNOD, in his individual
       capacity,

8)     JESSE WHITE, in his individual
       capacity,

(9)    WILLIAM COOPER, in his
       individual capacity,

10)    JANE KIRBY, in her individual
       capacity,

11)    JON ECHOLS, in his individual
       capacity,

**DISTRICT COURT**
**F I L E D**
DEC 1 1 2017
DON NEWBERRY, Court Clerk
STATE OF OKLA. TULSA COUNTY

2017 DEC 11  PM 4: 29
DON NEWBERRY
COURT CLERK



Exhibit "1"

12)   TRENT SMITH, in his individual
       capacity,

13)   CINDY BILYEU, in her individual
       capacity

14)   NICOLE COBB, in her individual
       capacity,

15)   TAMERA JACKSON, in her
       individual capacity,

16)   DANNY HICKMAN, in his
       individual capacity,

17)   RHETT BURNETT, in his
       individual capacity

                    Defendants.

# PETITION

**COMES NOW**, Wesley Prince ("PRINCE") and for his cause of action

against the above named Defendants, would state as follows:

### PARTIES, JURISDICTION, VENUE

1.      The Plaintiff, Wesley Prince, is and was at all times herein mentioned

a citizen of the State of Oklahoma.

2.      The Board of County Commissioners for the County of Tulsa

("BOARD") is the legislative entity responsible for the actions of county

employees. *See* 19 O.S. § 4. BOARD is liable under state law for the actions of

2

county employees under a theory of *respondeat superior* consistent with the common law principles set forth by the Oklahoma Supreme Court in *Baker v. Saint Francis Hosp.*, 2005 OK 36, 126 P.3d 602, made applicable to the BOARD here pursuant to the Oklahoma Supreme Court decision in *Bosh v. Cherokee County Governmental Building Authority*, 305 P.3d 994 (Okla. 2013). Vic Regalado ("REGALADO") is the elected Sheriff of Tulsa County. He is responsible for the operational policies, procedures, customs, and usages in place at the David L Moss Criminal Justice Center ("DLMCJC").

3.      The City of Tulsa ("CITY") is the legislative entity responsible for the actions of city employees. CITY is liable under state law for the actions of city employees under a theory of *respondeat superior* consistent with the common law principles set forth by the Oklahoma Supreme Court in *Baker v. Saint Francis Hosp.*, 2005 OK 36, 126 P.3d 602.

4.      Upon information and belief, John Doe (TPD Officer) was at all times herein mentioned a citizen of the state of Oklahoma.

5.      Turn Key Health Clinics, LLC ("TURN KEY") is an Oklahoma for-profit corporation. In exchange for an annual base compensation of $5,784,000 from Tulsa County taxpayers, TURN KEY contracted with the BOARD and REGALADO to assume their state and federal law obligation to deliver mental and medical health care ("Healthcare Services") at the DLMCJC. [*See* Ex. 1, Master

Agreement for Comprehensive Healthcare Services ("Master Agreement")] TURN KEY generates profits for its shareholders by taking in more money for healthcare than it pays out. Upon information and belief, FLINT JUNOD, JESSE WHITE, WILLIAM COOPER, JANE KIRBY, JON ECHOLS, TRENT SMITH, CINDY BILYEU, NICOLE COBB, TAMERA JACKSON, DANNY HICKMAN, RHETT BURNETT, (hereinafter referred to as "EXECUTIVES" for TURN KEY, are or were policymaking agents or employees of TURN KEY who developed and approved of the TURN KEY policies or practices at issue in this matter. They are sued in their individual capacities.

6.     The Master Agreement between TURN KEY, BOARD, and REGALADO required compliance with standards promulgated by the National Commission of Correctional Health Care ("NCCHC") and the American Correctional Association ("ACA").

7.     TURN KEY is liable under state law for the actions of its agents and employees at the DLMCJC under a theory of *respondeat superior* consistent with the common law principles set forth by the Oklahoma Supreme Court in *Baker v. Saint Francis Hosp.*, 2005 OK 36, 126 P.3d 602.

8.     Within one year of the date of loss, on April 24, 2017, PRINCE served BOARD, CITY, and REGALADO with a Notice of Tort Claim, and served TURN KEY with a Title 57 Notice on August 10, 2017. More than 90 days have

4

passed since that time and no party has resolved any of the claims asserted in this Petition. There are no additional administrative procedures for PRINCE to exhaust.

9.      As a private corporation, TURN KEY is not entitled to any exemption from liability set forth in the Oklahoma Governmental Tort Claims Act ("GTCA"), 51 O.S. § 151 *et seq. See Sullins v. American Med. Resp. of Okla.*, 2001 OK 20, 23 P.3d 259.

10.     The events described below occurred in Tulsa County, Oklahoma, making jurisdiction and venue proper.

## STATEMENT OF FACTS

### THE PUBLIC-PRIVATE BUSINESS MODEL

11.     TURN KEY and its EXECUTIVES have a business model that generates revenue through governmental contracts. Through these contracts, TURN KEY assumes responsibility for the government's obligation to provide Healthcare Services to people who are not free to seek out healthcare for themselves.

12.     To obtain these contracts, TURN KEY and its EXECUTIVES submit bids to government vendors like BOARD. If awarded the contract, TURN KEY and the EXECUTIVES provide Healthcare Services in return for payment by the government vendor.

5

13.     For TURN KEY and its EXECUTIVES to achieve positive revenue from the contract, TURN KEY must provide Healthcare Services at a net profit.

14.     To achieve net profits, TURN KEY and the EXECUTIVES implemented policies, procedures, customs, or practices to reduce the cost of Healthcare Services in a manner that would maintain or increase their profit margin.

15.     There are no provisions in TURN KEY's contract creating or establishing any mandatory minimum expenditure for the provision of Healthcare Services.

16.     TURN KEY's contract incentivizes cost-cutting measures in the delivery of Healthcare Services at the DLMCJC to benefit TURN KEY's investors in a manner that deprives arrestees at the DLMCJC from receiving adequate medical care.

### ARREST INCIDENT

17.     On January 9, 2017, PRINCE had been working laying down flooring at River Spirit Casino in Tulsa.

18.     At some point on the evening of January 9, 2017, PRINCE became disoriented and wandered off of the job-site.

19.    Upon information and belief, PRINCE's delirium was the result of acute symptoms associated with renal failure and the onset of respiratory failure, due to pneumonia.

20.    At approximately 11:00 p.m. on January 9, 2017, PRINCE was contacted by an officer from the Tulsa Police Department ("TPD") who, concerned for PRINCE's obvious distress, called for an ambulance to examine PRINCE.

21.    Upon information and belief, TPD Officer John Doe then arrived and prevented PRINCE from being evaluated by paramedics. Instead Officer John Doe arrested PRINCE on suspicion of public intoxication without any field testing or evaluation by the medics on scene.

### ADMISSION AND TREATMENT FAILURE

22.    On January 9, 2017, PRINCE was arrested. He was booked into the DLMCJC at 12:10 a.m., on January 10, 2017.

23.    At the time of his admission, PRINCE alerted the intake nurse of the following: (1) that he was not a drug user; (2) that he was suffering from a medical emergency; (3) and that he was in need of immediate medical assistance.

24.    The TURN KEY intake nurse disregarded his physical conditions and the obvious signs of distress by failing to properly screen, diagnose, or treat PRINCE for his serious, life-threatening condition.

7

25.     Despite PRINCE's obvious distress and pleas for help, he was misclassified and placed in general population in the early hours of January 10, 2017.

26.     For the next seven (7) days, PRINCE's condition continued to worsen as his kidneys and lungs began to shut down. During this time, PRINCE and other inmates at DLMCJC begged jailers to get help for PRINCE.

27.     On January 17, 2017, PRINCE's condition had deteriorated to a point where TURN KEY and DLMCJC employees could no longer ignore the serious medical emergency confronting them. By this point PRINCE was borderline unresponsive, disoriented, and having difficulty breathing.

28.     According to records from St. John Medical Center ("SJMC"), TURN KEY diagnosed PRINCE with pneumonia on January 17, 2017, and administered two (2) liters of normal saline, likely to combat PRINCE's severe dehydration that resulted from an inability to get himself water due to his condition. Despite this diagnosis hospital records do not memorialize any efforts at the DLMCJC to initiate antibiotics prior to his arrival at the hospital.

29.     SJMC records further indicate that the onset of PRINCE's symptoms, according to TURN KEY, occurred seven (7) days prior to his arrival at the Emergency Department ("ED"). This supports the inference that TURN KEY had

actual knowledge of PRINCE's worsening condition, but did nothing to diagnose or treat his illness.

30.     Rather than treat PRINCE for his illness at the time of his arrival on January 10, 2017, TURN KEY and county employees did nothing until PRINCE was on the verge of organ failure.

31.     Upon arrival at the SJMC ED, PRINCE was unable to give a history to the treating physician; he was disoriented and presented with slurred speech.

32.     It was determined in the ED that PRINCE was suffering from renal and respiratory failure. He was intubated and admitted to the hospital ICU in critical condition.

33.     Due to his kidney failure, PRINCE was placed on hemodialysis at least once per day while in the ICU from January 17 to January 21.

34.     PRINCE was moved from the ICU to a regular patient room on January 22, 2017, where he remained for another six days until his discharge on January 28, 2017. PRINCE received another round of hemodialysis on January 23, 2017.

## STATEMENT OF CLAIMS
### Negligence
### GTCA & common law

35.     PRINCE hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

9

36.     CITY is statutorily liable for the actions of its employees taken within the scope of their employment consistent with the provisions of the GTCA.

37.     CITY, through TPD, breached its duty of care by failing to render aid to PRINCE, and by disregarding PRINCE's need for a medical evaluation, and by denying PRINCE access to medical care.

38.     Similarly, TURN KEY owed a duty of reasonable care in the diagnosis and treatment of PRINCE's medical condition consistent with its contract and the Oklahoma Jail Standards.

39.     TURN KEY breached that duty through the conduct detailed above, which includes but is not limited to, the failure to conduct a proper receiving screening, the failure to base the classification recommendation upon a complete receiving screening, the failure to properly diagnose PRINCE's illness, and the failure to treat PRINCE's condition.

40. PRINCE suffered damages as a direct and proximate result of these acts or omission, for which TURN KEY and CITY are liable.

## Deliberate Indifference
## 42 U.S.C. § 1983

41.     PRINCE adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

42.     PRINCE's condition at the time of his arrest presented an imminent threat of serious harm. PRINCE relayed this information to JOHN DOE TPD

10

officer, which provided actual notice of his condition. JOHN DOE acted with indifference to the consequences, refused PRINCE any medical evaluation or treatment, and failed to take any steps designed to adequately address the risk to PRINCE in violation of 42 U.S.C. § 1983 for which JOHN DOE is liable.

43.    PRINCE's condition at the time of his intake and confinement at the DLMCJC presented an objectively serious risk of harm, and TURN KEY, through its agents and employees who were exposed to PRINCE's condition to worsen with indifference to the consequences for which TURN KEY is liable.

44.    Additionally, TURN KEY and its EXECUTIVES implemented written policies or maintained unwritten practices, as described above, that prioritized profits over treatment. As a direct and proximate result of these policies or practices, TURN KEY and the EXECUTIVES created a system that denied adequate health care to PRINCE with indifference to the consequences for which TURN KEY and the EXECUTIVES are liable under 42 U.S.C. § 1983.

### Violation of State Constitution
#### *Bosh v. Cherokee County Governmental Building Authority*
#### Art. 2, Sec. 7

45.    PRINCE adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

46.    The BOARD is exempt from liability for any of PRINCE's claims arising under the GTCA. Consequently, PRINCE is entitled to pursue a remedy against BOARD arising directly under the state constitution for the acts or

11

omissions of county employees acting within the scope of employment.

47.   The facts alleged herein are sufficient to establish a deprivation of constitutional proportions as it relates to the acts or omissions of jailers at DLMCJC, in addition to the practices of the Sheriff in the operation of the DLMCJC for which the BOARD is liable.

**WHEREFORE,** all premises considered, Plaintiff Wesley Prince, respectfully requests the Court grant judgment against the Defendants in an amount that exceeds $75,000.00

Respectfully submitted,

By: 

Hunter M. Siex, OBA# 33271
J. Spencer Bryan, OBA # 19419
Steven J. Terrill, OBA# 20869
BRYAN & TERRILL LAW, PLLC
9 East 4th St., Suite 307
Tulsa, OK 74103
Tele:  (918) 935-2777
Fax:  (918) 935-2778
Email: hsiex@bryanterrill.com
        jsbryan@bryanterrill.com
        sjterrill@byanterrill.com

12

*Attorneys for Plaintiff*

**ATTORNEY LIEN CLAIMED**
**JURY TRIAL DEMANDED**

APPROVED

NOV 2 1 2016

# TULSA COUNTY SHERIFF'S OFFICE
# TULSA COUNTY, OKLAHOMA





MASTER AGREEMENT FOR

**COMPREHENSIVE HEALTH SERVICES**

AT THE

DAVID L. MOSS CRIMINAL JUSTICE CENTER

TULSA, OKLAHOMA



EXHIBIT

1

This Contract is entered into between the Board of County Commissioners of Tulsa County, Oklahoma, on behalf of the Tulsa County Sheriff's Office ("Agency") and Turn Key Health Clinics, LLC ("Contractor"). The purpose of this Contract is to contract for the Medical Staffing and Administration of the David L. Moss Criminal Justice Center, located at 300 N. Denver Ave, Tulsa, OK 74103 (herein called the "Facility"), under the terms and conditions detailed in the Contract.

## I.   DUTIES AND RESPONSIBILITIES OF THE CONTRACTOR

### 1.1 SCOPE OF CONTRACT

Under Oklahoma law, every county is required to provide for a jail and fund its operation, and as specified by the standards promulgated pursuant to Section 192 of Title 74 of the Oklahoma Statutes, it is the duty of the sheriff of each county to provide required medical care for the inmates, detainees and other persons housed in the county jail ("inmates"). The Sheriff of Tulsa County is not a physician licensed within the State to provide medical care and treatment to others; accordingly, the purpose of this Contract is to discharge the sheriff's duty to provide the required medical care by contracting with Contractor who hereby represents and warrants to the Agency that it employs and/or contracts with the duly licensed and qualified physicians, psychiatrists, dentists, registered nurses, physician assistants, nurse practitioners, licensed practical nurses, dental assistants and licensed professional mental healthcare counselors ("Contractor personnel") necessary for the delivery of comprehensive healthcare services at the Facility. During the term of this contract, Agency personnel shall defer to the medical expertise and judgment of Contractor's personnel regarding all medical decisions. Notwithstanding the foregoing, the Agency reserves at all times the right to reasonably challenge any act or omission of Contractor personnel that appears below the standard of care that a layperson could reasonably expect from such professional.

Contractor shall be the sole supplier and/or coordinator of the health care delivery system at the Facility. The Contractor's responsibility for the medical care of an inmate commences with the commitment of the inmate to the custody of the Facility and ends with the release of the inmate. Services shall be in accordance with the laws of the State of Oklahoma, the American Correctional Association (ACA) standards, the National Commission on Correctional Healthcare (NCCHC) standards, and the Prison Rape Elimination Act (PREA).

Contractor will provide reasonable and necessary professional medical, dental, psychiatric, pharmaceutical, and related health care and administrative services ("comprehensive health care") for all inmates. Contractor's delivery of comprehensive health care will include a medical, dental and mental health care screening of inmates upon arrival at the Facility, regularly scheduled sick call, nursing coverage, regular provider visits (physician, physician assistant, ARNP), onsite infirmary care, physical evaluations, access to hospitalization, medical specialty services, and emergency medical care, medical records management, pharmacy services, health education and training, a quality assurance program, administrative support services, and other services, as more specifically described hereinafter. If Contractor finds that it cannot meet the terms of this contract or any part

2

thereof, it shall promptly notify Agency in writing of the area of non-compliance, so that the problem can be addressed

All detainees will be seen by the registered nurse (RN) or licensed practical nurse (LPN) in intake within a reasonable time but no later than four (4) hours of their arrival or immediately, if asked, unless there is an irregular influx of bookings, at which time the Contractor will use best efforts to complete within a reasonable time frame.

Staffing of the intake area will include one LPN or RN with a second LPN or RN during peak hours of operation, as necessary.

Workstations for each intake nurse must be complete with a computer (provided by TCSO) and all clinical tools necessary to perform this work. In the event the electronic system malfunctions, intakes will be completed on paper until the system is back up.

If, at any time, intake is backed up more than 4 hours, additional staff sufficient to clear the back-up will be required. In the event the backup is caused by a sudden influx of inmates, the Agency agrees contractor will be allowed a reasonable timeframe to secure additional staffing.

Inmates housed in the infirmary will be evaluated every shift by the infirmary nurse. Inmates housed in the segregated unit or in observation cells for suicide watch will be evaluated as medically indicated. An appropriate note in the EMR will be generated.

The Contractor agrees to notify the facility director or designee when key health services personnel, such as the Health Services Administrator and/or the Medical Director, will be off the grounds of the facility for any leave of absence exceeding 24 hours. A written notification must include the name, title, and contact information of the person providing coverage.

The Contractor will provide dietary consultation when such services are clinically indicated or needed as a part of a therapeutic regimen or treatment plan.

The Contractor will utilize a local retail pharmacy when necessary prescriptions cannot be readily obtained from other sources. When manufacturer problems or national shortages preclude the continuation of necessary medications, therapeutic substitutions will be made so that care is not interrupted. In the event of a national shortage of vaccines, the Contractor will follow recommendations of the Centers for Disease Control (CDC) and will track inmates/detainees who require vaccination and ensure its provision when supplies become available.

The Contractor shall identify to TCSO those inmates with medical/mental conditions which may be worsened as a result of being incarcerated at the Facility or which may re-

3

quire extensive care while incarcerated. After review of the circumstances surrounding the charges, and when security risks are minimal, the TCSO shall make every effort to have those inmates released.

The Contractor shall operate the clinic/infirmary seven (7) days per week, including Sundays and holidays for necessary treatments, history and physicals (H & P's), prioritized sick call, and urgent care. H&P's may not be performed on weekends or holidays unless it be necessary to be performed on those days in order to meet the 14 day requirement.

The physician or mid-level provider (MLP) will be physically on site daily. They are to perform and enter into the electronic medical record (EMR) an H&P within 24 hours for every patient admitted into the infirmary and to round in accordance to NCCHC and ACA standards. They are to be available by telephone or telemedicine (if available) twenty four (24) hours per day, seven (7) days per week for consultation by the nurse for questions pertaining to the infirmary, suicide watch, sick call, intake, H&P's or segregation units. They must, at a minimum, be certified in basic life support (BLS). It is permitted to have a resident physician in training as an adjunct to this call schedule acting under the supervision of the physician. As medically appropriate, a subjective/objective/assessment/plan/education (SOAPE) note will be entered in the EMR. LPN's may be staffed in the infirmary.

To the extent specialty care is required and cannot be rendered on-site, the Contractor will make appropriate off-site arrangements for the rendering of such care. The Contractor will make every effort to schedule routine off-site services in a manner convenient for TCSO transportation, and during the normal business hours of Monday through Friday, 8 a.m. to 4 p.m, or as reasonably agreed upon between the Contractor's and the specialist's office.

The Contractor shall identify to TCSO those inmates with medical/mental conditions which may be worsened as a result of being incarcerated at the Facility or which may require extensive care while incarcerated. After review of the circumstances surrounding the charges, and when security risks are minimal, the TCSO shall make every effort to have those inmates released.

The Contractor will provide ophthalmological services to the extent necessary to relieve or alleviate any exacerbation of a debilitating medical condition requiring ophthalmological services, or in the event of a court order to provide such services.

The Contractor will provide first response emergency medical treatment to Inmates, visitors, and TCSO staff as necessary and appropriate on-site. The Contractor will provide off-site emergency medical care for Inmates, as required, through arrangements to be determined with local hospitals. The Contractor will be responsible for providing and maintaining adequate and functional emergency equipment and for the training and certi-

4

fication (BLS) of appropriate Contractor staff to use that equipment. The numbers and location of AED's must be agreed upon by TCSO. Provision of emergency services to staff shall be limited to injuries or short-term emergency care received while on duty at the jail.

If services are requested by TCSO outside this contract (e.g. TSCO staff flu shots or Hepatitis C vaccinations), the Contractor shall make reasonable effort to provide such services. Such services will be at additional cost and will be invoiced to TCSO on a monthly basis. TCSO agrees to reimburse such costs within 30 days of the receipt of said invoice.

KIOSK REQUEST SYSTEM: Inmates at the Facility have access to an electronic system for general and specific questions/comments/complaints. The Contractor agrees that such requests categorized as a medical/healthcare specific question will be triaged within a reasonable time period of receipt by the Contractor in compliance with NCCHC and ACA accreditation standards.

USE OF INMATES IN THE PROVISION OF HEALTH CARE SEVICES.
Inmates will not be employed or otherwise engaged by either The Contractor or TCSO in the direct rendering of any health care services. Inmates may be used in positions not involving the rendering of health care services directly to Inmates as the Contractor and TCSO may mutually agree.

Commencing with the contract start date, and monthly thereafter, the Contractor shall submit staffing plans for the Facility to the TCSO. Any deviations from the established staffing plans must be communicated in writing to TCSO, including the reasons for the staffing shortage and the steps taken to alleviate the shortage.

DEFINITION: The Contractor shall institute a program of Continuous Quality Improvement (CQI) Program and Professional Peer Review, which will include, but not be limited to, audits, and medical record review. Physician peer reviews shall occur not less than annually. Within ninety (90) days of commencement of services under this agreement, the Contractor must provide evidence to the TCSO that a CQI Program is in place that includes quarterly meetings of the CQI committee and monthly Medical Audit Committee (MAC) meetings. The CQI program will use a multi-disciplinary committee and must involve all health care disciplines during the calendar year. Morbidity and Mortality reviews must come under the scope of CQI program.

The Contractor shall provide a peer review of all primary care providers to include physicians, psychiatrists, dentist, nurse practitioners, physician assistants, and Ph.D level psychologist, conducted on no less than annual basis. Peer reviews should include such activities as chart review, medical treatment plan review for special needs inmates, review of off-site consultations, specialty referrals, emergencies, and in-patient and outpatient hospitalization. The completion of the reviews should be appropriately documented. Where

5

possible or appropriate to affect the purposes of peer review, such proceeding will be conducted in accordance with applicable peer review statutes or regulations and applicable confidentiality requirements.

INMATE AND STAFF HEALTH EDUCATION. The Contractor will conduct an ongoing health education program for Inmates and correctional officers at the Facility. This health care education program will include, at TCSO's request, programs in first aid, signs and symptoms of chemical dependency and withdrawal, recognition of the suicidal signs, and reactions to medical emergencies.

The Contractor will be responsible for all long distance charges.

SUPPLIES. The Contractor warrants and represents that the quality and quantity of supplies provided by Contractor during this agreement will be sufficient to enable Contractor to perform its obligations hereunder.

After the first 90 days from the Contractor's commencement of services under this Agreement, a withhold from base compensation may be imposed by the TCSO for any unpaid hours on a monthly basis below total hours shown on Exhibit A. In such event, TCSO may deduct from its monthly payment to the Contractor at 100% of the average withhold rate for the position/category as set forth in Exhibit A which is attached and incorporated herein. In all cases, employees may be used to cover like positions when their credentials equal or exceed the credentials required for such position (e.g., an RN may cover for an LPN). The Contractor will provide TCSO with a monthly contract staffing compliance report showing all contract positions relative to the staffing matrix. Staffing deductions shall not apply in the event the Agency is more than 30 days past due with in reimbursement payment in accordance to Section 2.1.

## 1.2 INSURANCE

The Contractor will carry professional liability insurance in minimum amounts of One Million Dollars ($1,000,000.00) per occurrence and Three Million Dollars ($3,000,000.00) in the aggregate annually during the entire term and any renewal term of this Contract.

## 1.3 COMPLIANCE WITH APPLICABLE LAW

The Contractor will comply with applicable standards and laws set forth by the State of Oklahoma for the duration of the term of this Agreement with the Agency.

## 1.4 CONTRACTOR COOPERATION

All Contractor personnel, including the personnel of its subcontractor and agents, will be subject to security background checks and clearances by the Agency. In each instance, the individual and the Contractor will provide such cooperation as may be reasonably required to complete the security check. The Agency agrees to perform such security checks in a timely manner and not unduly delay such checks.

## 1.5 PHARMACEUTICAL

The Contractor shall provide a complete pharmaceutical system for inmates housed at the Facility. The Contractor will be responsible to pay the costs of pharmaceuticals and pharmaceutical supplies as required by current applicable law. The cost for pharmaceuticals, medications and associated supplies required to treat blood or organ disorders (i.e. hemophilia) shall be limited to $25,000.00 per year and shall be applied to the Maximum Limit defined in Section 1.9. This limit shall be pro-rated for any partial year of services. Costs exceeding the $25,000.00 limit shall be the responsibility of the Agency.

The Contractor shall provide for pharmaceutical services to assure the availability of prescribed medications within a reasonable time period of the order of issue being written except where such medications are not readily available in the local community. Pharmaceutical services shall be consistent with State and Federal regulations, and must be monitored by a licensed qualified pharmacist. The Agency agrees to allow the use of an inmate's home medication, as appropriate, upon the verification of the medication by Contractor personnel.

The Contractor shall provide for the recording of the administration of medications in a manner that includes documentation of the fact that inmates are receiving and ingesting their prescribed medications. Documentation will also be required when an inmate's ordered medication was not administered and the reason given.

## 1.6 OFF-SITE CARE AND HOSPITALIZATION

Contractor will arrange for off-site care and hospitalization for inmates who, in the opinion of the treating provider and/or the medical director, require hospitalization or care beyond the capabilities of the Facility. Costs for such services shall be included in the maximum liability amount in Section 1.9.

## 1.7 DENTAL CARE

As indicated, the Contractor shall provide basic oral screening and basic on-site dental care for inmates by on-site personnel. Contractor shall arrange and bear the cost of emergency dental services only if its medical director determines that such care is medically necessary and unable to be performed by on-site dental personnel. Dental services performed off-site will be considered off-site medical. Costs for such services shall be included in the maximum liability amount in Section 1.9.

## 1.8 SPECIALTY SERVICES

7

The Contractor shall provide for necessary laboratory, mobile or off-site x-rays, telemedicine, diagnostics, consultations and other on-site or off-site specialty services. The cost of these services will be considered off-site medical care, regardless of whether the services are performed at the facility or in the community. Costs for such services shall be included in the maximum liability amount in Section 1.9.

Contractor shall arrange healthcare services for any pregnant inmate, but Contractor shall not be responsible for the care or cost of any healthcare services provided to the inmate's infant(s).

Contractor shall not be responsible for the provision of eyeglasses, contact lenses, hearing aides, hearing aide supplies, or any other prosthesis devices.

## 1.9 FINANCIAL LIMITS

Contractor's Maximum annual combined liability for hospitalizations and other off-site medical services, off-site dental services, specialty services (x-ray, lab, consults, etc.), and medications and supplies associated with the treatment of blood or organ disease (i.e. hemophilia) shall be five hundred thousand dollars ($500,000.00). The aggregate limit shall be pro-rated accordingly on a daily rate basis for services provided during a partial year of services. In the event the aggregate maximum annual combined liability is exceeded in any given contract year, additional costs of services shall be submitted to the Agency for processing and appropriate payment. Not withstanding any other provision within this agreement, any and all costs incurred by the Contractor relating to or in the provision of offsite medical care, dental care, hospitalizations, specialty care, and specific medications will be subject to the limitations of liability.

## 1.10 INDEMNITY AND IMMUNITY

To the fullest extent permitted by law, Contractor shall indemnify and hold harmless Tulsa County, the Tulsa County Criminal Justice Authority, the Tulsa County Sheriff's Office, the Board of County Commissioners of Tulsa County, Oklahoma, the Agency and its elected officials, agents, servants and/or employees from all claims, actions, lawsuits, damages, judgments or liabilities arising out of the Contractor's delivery of health care services at the Facility.

Nothing herein waives Agency's defense of immunity from suit as provided by Oklahoma Law. The terms and provisions of this Section 1.10 shall survive the termination of this Contract.

## 1.11 FILING WITH INSURANCE

Whenever possible, Contractor will defer payment to an inmate's personal health insurance provider for off-site medical expenses in accordance with Oklahoma law, and as appropriate.

## 1.12 NEGOTIATION OF DISCOUNTS

Contractor shall use its best efforts to negotiate discounts for medical services and pharmaceuticals.

8

## 1.13 PERSONNEL RECORD KEEPING

Contractor shall be responsible to ensure licenses, insurances, workers' compensation, and employment terms for contracted personnel are in place. The Contractor shall, upon request, provide to the Agency proof of licenses and/or certificates for all professional personnel. In addition, professional liability coverage must be in place for all physicians and Nurse Practitioners/Physician Assistants, and other employees or agents of Contractor providing medical or mental health services to inmates.

## 1.14 STATISTICS

Statistics shall be maintained and provided to the Jail Administrator and/or the Contract Monitor on a monthly basis.

## 1.15 GRIEVANCES

Grievances shall be monitored to detect areas of concern. Inmate grievances shall be documented according to Facility policy, and Contractor personnel shall prepare a response. Contractor shall keep Agency informed of the status of all grievances.

## 1.16 EMERGENCY ASSISTANCE

The Contractor shall, in times of emergency or threat thereof, whether accidental, natural or man-made, provide medical assistance to the Facility to the extent or degree required.

## 1.17 MEDICAL AND NURSING SERVICES PROVIDED

All medical personnel providing services through Contractor under this Contract shall be the employees and/or agents of Contractor and not of the Agency. Such individuals shall hereby be referred to as the "Medical Staffing". All wages, worker's compensation, insurance, benefits, vacations, and claims of any kind relating to the Medical Staffing shall be the sole responsibility of Contractor and not of Agency.

Contractor shall provide medical unit coverage twenty-four hours a day, seven days a week in accordance to the matrix in Attachment A.

The Contractor shall ensure:

a) Initial health screenings are performed for inmates upon admission to the facility within a timely manner;

b) Adequate staffing levels to ensure appropriate delivery of care in the infirmary;

c) Tuberculosis Skin Testing (TST) and History and Physicals for all inmates within fourteen (14) days of incarceration;

9

d) Medications are administered as prescribed;

e) Timely sick call triage and follow-up;

f) Appropriate and timely response to medical needs and emergencies; and

g) Operations are in compliance with Oklahoma Jail Standards (OJS), American Correctional Association (ACA), the National Commission on Correctional Health Care (NCCHC), and the Prison Rape Elimination Act (PREA).

Medical care shall be provided in a manner that is commensurate with the national standard of medical care and treatment.

Personnel files (or copies thereof) of Contractor's employees assigned to the Facility are to be maintained at Turn Key's corporate office and shall be available to the Agency upon written request.

## 1.18 SATISFACTION WITH HEALTHCARE STAFF

In recognition with the sensitive nature of correction facility operations, if the Sheriff becomes dissatisfied with any member of the Contractor's medical staff, the Sheriff shall provide Contractor written notice of such dissatisfaction and the reasons therefore.  Following receipt of such notice, Contractor shall use commercially reasonable efforts to resolve the dissatisfaction.  If the problem is not resolved to the satisfaction of the Sheriff within ten (10) business days following the Contractor's receipt of the notice, Contractor shall remove the individual from providing services at the Facility within a reasonable timeframe considering the affects of such removal on Contractor's ability to deliver healthcare services and recruitment/hiring of an acceptable replacement.  The Sheriff reserves the right to revoke the security clearance of any of Contractor's Medical Staffing at any time.

## 1.19 TESTIFYING IN COURT

Contractor personnel shall be aware that they might, from time to time, be subpoenaed to testify in court or at a deposition regarding medical treatment.  Overtime, if any, associated with this obligation is the responsibility of the Contractor.  Contractor will keep the Agency informed of any and all requests.

## 1.20 POLICIES AND PROCEDURES / PROTOCOLS

A written manual of the Agency and Contractor's standardized policies and defined procedures will be available at all times for Contractor personnel. Contractor's nursing protocols shall be devised and approved by a licensed physician.  Policies and procedures and nursing protocols will be reviewed and revised as required.

## 1.21 TRANSPORTATION

The Contractor will coordinate with the Agency to arrange for inmate transportation for emergency ambulance care.  All other non-emergent transportation relating to the provision of health services shall be the responsibility of the Agency.

## 1.22 NON-INMATE HEALTH SERVICES

Non-inmate health services shall be provided in the form of emergency care for Facility staff and visitors for the purpose of stabilizing the condition and arranging for transport. Emergency services include first aid, assessment, stabilization and the coordination of transport of employees or visitors who become ill or injured in the Facility.

The Contractor will provide prophylactic care assessment to TCSO employees and the Contractor's employees in the event of possible exposure to blood borne pathogens as required by NCCHC. For the purpose of this section, communicable disease shall be defined as blood borne diseases such as Human Immunodeficiency Virus (HIV) or Hepatitis. Should possible exposure occur, the exposed individual shall present to Contractor's personnel to be evaluated, and, as medically indicated and authorized by the individual being evaluated, provided emergent care. The Contractor shall instruct the individual on any additional follow-up that may be necessary. The individual's health care provider shall provide all follow-up care.

The Contractor shall make available the Hepatitis B vaccination program and annual Tuberculosis Skin Testing (TST) for all Facility staff as requested by the Sheriff.  However, the Agency will bear the cost of the vaccine and serum.

## 1.23 INMATES FROM OTHER JURISDICTIONS

The Contractor will provide medical services to all Oklahoma Department of Corrections, ICE and Marshal's service detainees while such individuals are detained at the Facility.  All billable (off-site medical services and itemized on-site care, supplies or pharmaceuticals) charges will be submitted for payment to the appropriate responsible party. Should such billing and reimbursement only be accepted through Tulsa County, all reimbursements will ultimately be paid back to the Contractor.  It is not the intent of this provision that the Contractor would be required to pay for any pharmaceuticals, off-site care, or specialty services for any ICE, DOC, or Marshal detainees.

## 1.24 MEDICAL RECORDS REQUIREMENTS

A medical record consistent with state regulations and national standards of practice shall be maintained for each inmate. These records shall be kept separate from the jail confinement records of the inmate.

In any case where medical care is at issue, or in any criminal or civil litigation where the physical or mental condition of an inmate is at issue, the Contractor shall make accessible to the Sheriff such records and, upon request, provide copies.   The Contractor additionally acknowledges

11

compliance with and understanding of all applicable HIPAA requirements as they apply to correctional facilities.

The Contractor acknowledges and agrees that all records prepared or acquired by the Contractor during performance of services under the Contract are the property of the Tulsa County Sheriff's Office. The Contractor shall be considered the records custodian during the duration of the Contract. Upon the termination of this Contract, all inmate medical records shall remain in the care and custody of the Agency.

Any and all legal actions or requests affecting Tulsa County inmates and/or the Contractor's performance within the Agency in Tulsa County must be communicated, in writing, to the Agency within twenty-four hours of the Contractor's receipt.

The Contractor may elect to maintain inmate medical records, in accordance with Federal and State regulations, on a server outside the facility hosted by a third-party

The Contractor at all times shall provide to Agency's contract monitor(s) read-only access to all portions of every inmates electronic medical record maintained by Contractor. Such access to include the ability to print a hard copy of said medical record or to print portions thereof as may be needed and

The Contractor will comply HIPPA and HITECH Acts as stated within the Business Associates agreement dated November 21, 2016.

## 1.25 CONTAMINATED WASTE

The Contractor shall be responsible for the disposal of all infectious or hazardous waste associated with health services. The material must be removed from the Facility and dis-posed of as regulated by federal, state and local laws.

## 1.26 ACCREDITATION

Contractor's services hereunder will be designed to be in compliance with the standards developed by the NCCHC Jail Standards and the ACA Standards for Adult Correctional Institutions in accordance with the most recent editions. However, the Contractor shall not be responsible for failure due to standards that are not directly related to medical care.

The Contractor will schedule and pay for the NCCHC accreditation at its cost, including a mock survey if requested by the TCSO. ACA accreditation costs shall be paid by the TCSO.

## 1.27 TELEHEALTH

In an effort to minimize the need to transport inmates off-site for health services and to provide on-site medical care for inmates, the Contractor agrees to pursue innovative programs such as

telehealth services. The Contractor agrees to update the Agency quarterly on the status of implementation.

## II. DUTIES OF AGENCY

### 2.1 REIMBURSEMENT FOR SERVICES

The reimbursement for the initial Contract from Agency to Contractor is to be made on a monthly basis in the amount of Four Hundred Eighty-Two Thousand Dollars and zero cents ($482,000.00), pro-rated for any partial months and subject to any reconciliation, as applicable. The first payment for the month of December 2016 is to be paid to the Contractor by the 1st day of January 2017 for services administered for the month of December. All subsequent payments shall be paid in the full amount by the Agency to the Contractor before or on the 1st day of the month for services rendered the previous month.

This Agreement shall cover services provided by the Contractor for the Agency with a facility average daily population (ADP) up to one thousand eight hundred (1,800) inmates. The ADP will be calculated as the monthly total for all inmates in the jail at 8:00 am each day divided by the number of days in that month. Should the ADP exceed 1,800 inmates for three consecutive months, the Contractor and Agency agree to renegotiate the terms of reimbursement for the Contract.

### 2.2 USE OF FACILITY AND EXISTING MEDICAL AND OFFICE EQUIPMENT

The Agency shall be responsible for providing the non-exclusive use and access to certain office equipment (copier, fax machine, phones, desks, office chairs, etc.), durable medical equipment (exam tables, sinks, cabinets, etc.), internet access, and phone service required for the administrative operation of the medical unit. Agency agrees that Contractor will be provided appropriate space in the Facility to perform all required duties and that the Contractor will be allowed use of the current office, medical equipment and supplies currently at the facility at the initiation of services. Contractor will be responsible for all preventative and predictive maintenance on Agency's equipment, but will not be responsible for replacement of Agency's equipment.

In the event additional durable office or medical equipment needs to be purchased, it will be the Agency's responsibility to purchase any equipment that exceeds $500.00 in cost. All equipment shall be owned by the Agency. Provided that, Contractor shall provide and bear the cost of standard disposable medical supplies.

## III. GENERAL TERMS AND CONDITIONS

### 3.1 ALTERATIONS TO CONTRACT

13

Any alterations, variations, modifications, or waivers of the provisions of the Contract will be valid only if they are reduced to writing, duly signed by the parties and attached to the original Contract.

## 3.2 FORCE MAJEURE

Neither party shall be liable in damages or have the right to terminate this Agreement for any delay or default in performing hereunder if such delay or default is caused by conditions beyond its control including, but not limited to Acts of God, Government restrictions (including the denial or cancellation of any export or other necessary license), wars, insurrections and/or any other cause beyond the reasonable control of the party whose performance is affected.

## 3.3 TERMINATION OF CONTRACT

A.    Termination for Cause

1.    If either party fails to fulfill its obligations under the Contract in a timely proper manner, or if either party violates any material covenant, agreement, or stipulation of the Contract, the aggrieved party shall thereupon have the right to terminate the Contract by giving written notice of termination to the other party, which such notice shall be given not less than thirty (30) calendar days prior to the stated effective date of termination The notice shall specify the effective date of the termination, and the reasons therefore, unless the party to whom notice is given cures the breach to the satisfaction of the party giving notice prior to the effective date of termination.

2.    Notwithstanding the above, the Contractor shall not be relieved of liability to the Agency for damages sustained by the Agency by virtue of any breach of the Contract by the Contractor and the Agency may withhold any payments to the Contractor, in an amount reasonably calculated to equal the estimated damages, for the purpose of setoff until such time as the exact amount of damages to the Agency from the Contractor is determined.

B.    Termination for Convenience

The Agency or Contractor may terminate the Contract at any time by giving written notice to the Contractor of termination, which such notice shall be given not less than one hundred twenty (120) calendar days prior to the stated effective date of termination.

C.    Termination upon Bankruptcy, Insolvency

Either Party may terminate this Agreement immediately upon written notice after the other Party has executed an assignment for the benefit of creditors or file for relief under any applicable bankruptcy, reorganization, moratorium, or similar debtor relief laws, or in the event that the receiver has been appointed for the other Party or any of its assets or properties, or an involuntary petition in bankruptcy has been filed against such other Party, which proceeding or has the

14

strength that which proceeding or petition has not been dismissed, vacated, or stayed within 30 days. This clause extends to any subcontractors the Contractor may choose to employ.

D.    Payment due to Termination

Upon termination of this Contract for any reason, prior to the end of the then existing term, the Contractor will be paid up to the effective termination date such sums and expenses, prorated as necessary, in accordance with those monthly fees described in paragraph 2.1.

E.    Records and Documentation Remain the Property of the Agency

All medical records, Agency policies and procedures, Agency manuals, instructional books, orientation, and continuing education records shall be the property of the Agency and, at the termination of the Contract, remain the property of the Agency without further obligation.

F.    Upon termination of this agreement, total responsibility for providing health care services to all Inmates, including Inmates receiving health care services off-site will be transferred from the Contractor to the Agency.

## 3.4 CONTRACTUAL WITHHOLDS

Within ninety (90) days of the execution of this agreement, the Agency and the Contractor agree to meet in good faith to define contractual performance thresholds that may include reductions of the reimbursement fees as defined in Section 2.1. The Agency and the Contractor agree that withholds may include reductions do to the inability to maintain adequate personnel levels as defined in Attachment A, reductions due to the inability to maintain ACA or NCCHC accreditation, reductions for delays in completing intake screenings and/or health assessment within a specified time period, and/or reductions for performance that falls below mutually agreed upon additional quality assurance thresholds.

## IV.    CONTRACT TERM

The Contract shall commence on December 1, 2016 and will continue through June 30, 2017. This Contract will be eligible for renewal for indefinite consecutive one (1) year terms upon the mutual agreement of the Agency and Contractor. Changes to the Contract, including the term and reimbursements for services, will be discussed and agreed upon by both parties prior to the beginning of each extended Contract year.

## V.    MISC.

## 5.1 INDEPENDENT CONTRACTOR STATUS

15

It is mutually understood and agreed, and it is the intent of the parties hereto that an independent contractor relationship be and is hereby established under the terms and conditions of this Contract. Nothing in this Contract shall be construed to create an agency relationship, an employer/employee relationship, a joint venture relationship, or any other relationship allowing the Agency to exercise control or direction over the manner or methods by which Contractor, its employees, agents or subcontractors perform hereunder, or Contractor to exercise control or direction over the manner or methods by which the Agency and its employees, agents or subcontractors perform hereunder, other than as provided in this Contract.

## 5.2 SUBCONTRACTING

In order to discharge its obligation hereunder, Contractor may engage certain physicians as independent contractors rather than employees ("Contract Professionals"). Contractor shall not engage any Contract Professionals that do not meet the applicable professional licensing requirements and Contractor shall exercise administrative supervision over such Contract Professionals as necessary to insure the strict fulfillment of the obligations contained in this Contract. Services provided by Contract Professionals under this Contract shall be provided in a manner reasonably consistent with the independent medical judgment the Contract Professionals are required to exercise.

## 5.3 CONTRACTOR TO RECEIVE BENEFIT OF STATUTORY RATE REDUCTIONS

Agency agrees to cooperate with Contractor for purposes of asserting any statutory rights afforded to the Agency or the Facility to pay providers for medical services at certain reduced rates (e.g., Statute 19-746) so that Contractor may legally receive the benefit of such reduced rates.

## 5.4 EQUAL OPPORTUNITY EMPLOYER

Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, ancestry, national origin, place of birth, marital status, sexual orientation, age or handicap unrelated to a bona fide occupational qualification of the position or because of status as a disabled veteran or Vietnam-Era veteran. Contractor will distribute copies of its commitment not to discriminate to all persons who participate in recruitment, screening, referral and selection of job applicants, and to prospective job applicants.

## 5.5 WAIVER OF BREACH

The waiver of either party of a breach or violation of any provision of this Contract shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

## 5.6 NOTICES

Any notice of termination, requests, demands or other communications under this Contract shall be in writing and shall be deemed delivered: (a) when delivered in person to a representative the

16

parties listed below: (b) 3 days after mailing when mailed by first-class certified mail, return receipt requested, addressed to the party at the address below; or (c) upon confirmation of receipt if sent by electronic means or facsimile to the parties listed below:

If for Turn Key:

> Turn Key Health Clinics, LLC
> Attn: Flint Junod, CEO
> 19 NE 50th Street
> Oklahoma City, OK 73105

> Telephone: (405) 516-0276

If for Tulsa County Sheriff's Office:

> Vic Regalado, Sheriff
> Tulsa County Sheriff's Office
> 303 W. 1st Street
> Tulsa, OK 74103

> with a copy to:

> Tulsa County Commissioners
> Chairman of the Board
> 500 South Denver Avenue
> Tulsa, OK 74103

> Telephone: (918) 596-5601

Either party may change such address or phone number from time to time by providing written notice as provided above.


## 5.7 GOVERNING LAW

This Contract shall be governed by and construed in accordance with the laws of the State of Oklahoma and the County of Tulsa without regard to the conflicts of laws or rules of any jurisdiction.

Notwithstanding anything herein to the contrary, if (i) any applicable law, statute, regulation, ordinance, standard, rule, court order or decree, policy, practice or procedure of any applicable governmental unit, agency or office (including but not limited to the federal, state or local courts, legislative bodies, and agencies, including Tulsa County Sheriff's Office and/or Tulsa County, or their respective officers or agents) is adopted, implemented, amended or changed, or if (ii) any standard of care or treatment protocol changes or evolves in any material respect, or if any new

17

medication or therapy is introduced or mandated to treat any illness, disease or condition, and if such change, as described in either (i) or (ii), materially increases the cost to the Contractor of providing healthcare services hereunder; then the Contractor and Agency will meet to negotiate compensation or service requirement changes. The parties agree to meet and negotiate in good faith within thirty (30) days following the giving of notice by one party to the other party of a change (whether such change is anticipated or implemented). If the parties fail to reach agreement regarding compensation or service requirement changes within the foregoing thirty (30) day period, then either the Contractor or Agency may terminate their Agreement with Tulsa County upon sixty (60) days prior written notice.

## 5.8 COUNTERPARTS

This Contract may be executed in several counterparts, each of which shall be considered an original and all of which shall constitute but one and the same instrument.

## 5.9 TITLE OF PARAGRAPHS

Titles of paragraphs are inserted solely for convenience of reference and shall not be deemed to limit, expand or otherwise affect the provisions to which they relate.

## 5.10 ORDER OF CONTRACTUAL ADHERENCE

The order of contractual adherence shall be bound by the most recent written agreement or understanding between the Agency and the Contractor. Order of adherence shall be as follows:
1. The most current Addendum to the Contract.
2. The original Contract between the Contractor and Agency.
3. The Contractor's Proposal.
4. The Agency's RFP.

## 5.11 SEVERABILITY

In the event that any one or more provisions of this Contract shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Contract and this Contract shall be construed and enforced as if such invalid, illegal or unenforceable provision had never been contained herein.

## 5.12 PERFORMANCE BOND

The Contractor shall provide a performance bond in the amount of $1,000,000.00.

## 5.13 ENTIRE CONTRACT

18

This Contract, including the RFP and Contractor's proposal, constitutes the entire agreement of the parties and is intended as a complete and exclusive statement of the promises, representations, negotiations, discussions and agreements that have been made in connection with the subject matter hereof.  In the event of a conflict, the contract will take precedence, secondly the Proposal and then the RFP. This Contract may be amended at any time, but only with the written consent of all parties.

IN WITNESS WHEREOF, the parties have caused this Contract to be executed as their official action by their respective representative, each of whom is duly authorized to execute the same.

AGREED TO AND ACCEPTED AS STATED ABOVE:

TURN KEY HEALTH CLINICS, LLC.

Dated: __11/17__, 2016   By: _____

Flint Junod
Chief Executive Officer

TULSA COUNTY SHERIFF'S OFFICE

Dated: __11/17__, 2016   By: _____

Vic Regalado, Sheriff

TULSA COUNTY BOARD OF COUNTY COMMISSIONERS

Dated: __11/21__, 2016   By: _____

Karen Keith, Chairperson

ATTEST:

Pat Key by Nancy _____

Pat Key, County Clerk

(SEAL)

_____
APPROVED AS TO FORM
ASSISTANT/DISTRICT ATTORNEY

19

ATTACHMENT A

| POSITION | FTE |
|---|---|
| **DAY SHIFT** | |
| Health Services Administrator | 1.00 |
| Administrative Assist | 1.00 |
| Medical Records | 1.00 |
| Director of Nursing | 1.00 |
| Medical Director | 0.80 |
| ARNP/PA | 2.00 |
| Psychiatrist | 1.00 |
| Mental Health Administrator | 1.00 |
| Mental Heath Professional | 3.00 |
| Community Coordinator | 1.00 |
| Dentist | 0.80 |
| Dental Assist / Med Records | 0.90 |
| Utilization & Case Manager | 1.00 |
| QI / Educator | 1.00 |
| RN | 5.80 |
| LPN | 18.40 |
| CMA - Med Pass | 8.40 |

21

STATE OF OKLAHOMA
TULSA COUNTY
**IN THE DISTRICT COURT FOR TULSA COUNTY**     RECEIVED     4756
**STATE OF OKLAHOMA**

2018 MAY -4  AM 10: 04

| | |
|---|---|
| WESLEY PRINCE, | MICHAEL WILLIS |
| | TULSA COUNTY CLERK |
| Plaintiff, | |
| | |
| v. | Case No.: CJ-17-4900 |
| | **RECEIVED** |
| Board of County Commissioners, | |
| *et al.,* | MAY 04 2018 |
| Defendants. | |
| | District Attorney |
| | Dist #14 |

**SUMMONS**

To the above-named Defendant(s):  Board of County Commissioners of Tulsa County, Oklahoma
c/o Michael Willis, County Clerk for Tulsa County, Oklahoma
Ray Jordan Administration Building
500 S. Denver
Tulsa, OK 74103

You have been sued by the above-named plaintiff(s), and you are directed to file a written answer to the attached petition in the court at the above address within twenty (20) days after service of this summons upon you exclusive of the day of service.  Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff.  Unless you answer the petition within the time stated judgment will be rendered against you with the costs of the action.

If Interrogatories and Request for Production of Documents are served with this Petition, you are directed to answer the Interrogatories and produce the documents requested within **forty-five (45) days** after service of these Interrogatories and Request for Production of Documents.

Issued this_____1_____ day of _____5_____, 2018.

DON NEWBERRY, Court Clerk , Court Clerk
by_____, Deputy Court Clerk

(Seal)
Attorney(s) for Plaintiff(s):

Name:       BRYAN & TERRILL LAW, PLLC
Address:    9 East 4th St., Suite 307
            Tulsa, OK 74103
            (918) 935-2777

This summons was served on . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
(Date of Service)

Exhibit "2"





## IN THE DISTRICT COURT FOR TULSA COUNTY
## STATE OF OKLAHOMA

(1)   WESLEY PRINCE,

                        Plaintiff,

v.

                                          Case No.: CJ-2017-04900
                                          Judge Rebecca Nightingale

(2)   BOARD OF COUNTY
      COMMISSIONERS FOR THE
      COUNTY OF TULSA, *et al.*

                                          **DISTRICT COURT**
                                          **FILED**

                                          MAR 1 6 2018

                        Defendants.       DON NEWBERRY, Court Clerk
                                          STATE OF OKLA. TULSA COUNTY

### EX PARTE MOTION FOR SUBSTITUTION OF PARTIES

Plaintiff Wesley Prince submits the following Ex Parte Motion to Substitute Defendants. In support of his motion, Plaintiff states the following:

1.   On December 11, 2017 Plaintiff filed his petition in the above captioned case. [See Docket].

2.   Since that date, Plaintiff has determined the identity of the above named John Doe, TPD officer.

3.   Upon information and belief, the proper TPD officer to be named is Stephen Tidwell.

4.   The proper party to be substituted is Stephen Tidwell, TPD officer, in place of John Doe, TPD officer.

5.   A proposed order is attached.



P

**WHEREFORE,** all premises considered, Plaintiff respectfully requests the Court grant Plaintiff's Motion for Substitution of Parties, and adopt the substituted parties for this matter.

Respectfully submitted,

BRYAN & TERRILL

By: _____
Hunter M. Siex, OBA # 33271
Steven J. Terrill, OBA # 20869
J. Spencer Bryan, OBA # 19419
BRYAN & TERRILL LAW, PLLC
9 East 4th St., Suite 307
Tulsa, OK 74103
Tele:   (918) 935-2777
Fax:    (918) 935-2778
Email:  jsbryan@bryanterrill.com
Email:  sjterrill@bryanterrill.com
*Attorneys for Wesley Prince*

2



*1 0 3 9 8 4 3 3 6 8*

## IN THE DISTRICT COURT FOR TULSA COUNTY STATE OF OKLAHOMA

**DISTRICT COURT**
**F I L E D**

MAR 1 9 2018

DON NEWBERRY, Court Clerk
STATE OF OKLA TULSA COUNTY

(1)   WESLEY PRINCE,

           Plaintiff,

v.

(2)   BOARD OF COUNTY
COMMISSIONERS FOR THE
COUNTY OF TULSA, *et al.*

           Defendants.

Case No.: CJ-2017-04900
Judge Rebecca Nightingale

---

### ORDER

---

The cause is before the Court on the ex parte motion of Plaintiff Wesley Prince to substitute parties in the above matter. The Court finds that the Order substituting Stephen Tidwell, TPD officer, as Defendant should be granted.

**IT IS THEREFORE ORDERED** that John Doe, TPD officer should be removed as a party.

**IT IS FURTHER ORDERED** that Stephen Tidwell, TPD officer, shall be substituted as a defendant.

DATED this **16** day of **March**, 20**18**.

                              _____
                               HONORABLE REBECCA NIGHTINGALE

1

Exhibit "4"



OKLAHOMA
State Courts Network

The information on this page is NOT an official record. Do not rely on the correctness or completeness of this information. Verify all information with the official record keeper. The information contained in this report is provided in compliance with the Oklahoma Open Records Act, 51 O.S. 24A.1. Use of this information is governed by this act, as well as other applicable state and federal laws.

# IN THE DISTRICT COURT IN AND FOR TULSA COUNTY, OKLAHOMA

WESLEY PRINCE,
    Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS FOR TULSA
COUNTY,
    Defendant, and
VIC REGALADO,
    Defendant, and
CITY OF TULSA,
    Defendant, and
STEPHEN TIDWELL, TPD OFFICER,
    Defendant, and
TURN KEY HEALTH CLINICS LLC,
    Defendant, and
FLINT JUNOD,
    Defendant, and
JESSE WHITE,
    Defendant, and
WILLIAM COOPER,
    Defendant, and
JANE KIRBY,
    Defendant, and
JON ECHOLS,
    Defendant, and
TRENT SMITH,
    Defendant, and
CINDY BILYEU,
    Defendant, and
NICOLE COBB,
    Defendant, and
DANNY HICKMAN,
    Defendant, and
RHETT BURNETT,
    Defendant.

**No. CJ-2017-4900**
**(Civil relief more than $10,000: LEGAL NEGLIGENCE)**

Filed: 12/08/2017

Judge: Nightingale, Rebecca B.

# PARTIES



Exhibit "5"

BILYEU, CINDY, Defendant
BOARD OF COUNTY COMMISSIONERS FOR TULSA COUNTY, Defendant
BURNETT, RHETT, Defendant
CITY OF TULSA, Defendant
COBB, NICOLE, Defendant
COOPER, WILLIAM, Defendant
ECHOLS, JON, Defendant
HICKMAN, DANNY, Defendant
JUNOD, FLINT, Defendant
KIRBY, JANE, Defendant
PRINCE, WESLEY, Plaintiff
REGALADO, VIC, Defendant
SMITH, TRENT, Defendant
TIDWELL, STEPHEN, Defendant
TURN KEY HEALTH CLINICS LLC, Defendant
WHITE, JESSE, Defendant

## ATTORNEYS

| Attorney | Represented Parties |
|---|---|
| Bryan, J Spencer (Bar #19419)<br>Bryan & Terrill Law, PLLC<br>9 East 4th Street, Suite 307<br>Tulsa, OK 74103 | PRINCE, WESLEY |
| Siex, Hunter M (Bar #33271)<br>Bryan & Terrill Law, PLLC<br>9 East 4th Street, Suite 307<br>Tulsa, OK 74103 | PRINCE, WESLEY |
| TERRILL, STEVEN J (Bar #20869)<br>BRYAN & TERRILL LAW, P.L.L.C.<br>9 EAST 4TH STREET<br>SUITE 307<br>TULSA, OK 74103 | PRINCE, WESLEY |

## EVENTS

None

## ISSUES

For cases filed before 1/1/2000, ancillary issues may not appear except in the docket.

**Issue # 1.**     Issue: LEGAL NEGLIGENCE (LEGALNEGL)
          Filed By: PRINCE, WESLEY
          Filed Date: 12/08/2017

| Party Name | Disposition Information |
|---|---|

**Defendant:**
BOARD OF COUNTY COMMISSIONERS FOR TULSA COUNTY

**Defendant:** REGALADO, VIC

**Defendant:** CITY OF TULSA

**Defendant:** TURN KEY HEALTH CLINICS LLC

**Defendant:** SMITH, TRENT

**Defendant:** COOPER, WILLIAM

**Defendant:** JUNOD, FLINT

**Defendant:** WHITE, JESSE

**Defendant:** KIRBY, JANE

**Defendant:** ECHOLS, JON

**Defendant:** BILYEU, CINDY

**Defendant:** COBB, NICOLE

**Defendant:** HICKMAN, DANNY

**Defendant:** BURNETT, RHETT

**Defendant:** TIDWELL, STEPHEN

# DOCKET

| Date | Code | Description | Count | Party | Amount |
|---|---|---|---|---|---|
| 12-11-2017 | TEXT | CIVIL RELIEF MORE THAN $10,000 INITIAL FILING. | 1 | | |
| 12-11-2017 | LEGALNEGL | LEGAL NEGLIGENCE | | | |
| 12-11-2017 | DMFE | DISPUTE MEDIATION FEE | | | $ 7.00 |
| 12-11-2017 | PFE1 | PETITION<br>Document Available (#1038772887) 🖹TIFF    📄PDF | | | $ 163.00 |
| 12-11-2017 | PFE7 | LAW LIBRARY FEE | | | $ 6.00 |
| 12-11-2017 | OCISR | OKLAHOMA COURT INFORMATION SYSTEM REVOLVING FUND | | | $ 25.00 |
| 12-11-2017 | OCJC | OKLAHOMA COUNCIL ON JUDICIAL COMPLAINTS REVOLVING FUND | | | $ 1.55 |
| 12-11-2017 | OCASA | OKLAHOMA COURT APPOINTED SPECIAL ADVOCATES | | | $ 5.00 |
| 12-11-2017 | SSFCHSCPC | SHERIFF'S SERVICE FEE FOR COURTHOUSE SECURITY PER BOARD OF COUNTY COMMISSIONER | | | $ 10.00 |
| 12-11-2017 | CCADMINCSF | COURT CLERK ADMINISTRATIVE FEE ON COURTHOUSE SECURITY PER BOARD OF COUNTY COMMISSIONER | | | $ 1.00 |
| 12-11-2017 | CCADMIN0155 | COURT CLERK ADMINISTRATIVE FEE ON $1.55 COLLECTION | | | $ 0.16 |
| 12-11-2017 | SJFIS | STATE JUDICIAL REVOLVING FUND - INTERPRETER AND TRANSLATOR SERVICES | | | $ 0.45 |

| Date | Code | Description | Count | Party | Amount |
|------|------|-------------|-------|-------|--------|
| 12-11-2017 | DCADMIN155 | DISTRICT COURT ADMINISTRATIVE FEE ON $1.55 COLLECTIONS | | | $ 0.23 |
| 12-11-2017 | DCADMIN05 | DISTRICT COURT ADMINISTRATIVE FEE ON $5 COLLECTIONS | | | $ 0.75 |
| 12-11-2017 | DCADMINCSF | DISTRICT COURT ADMINISTRATIVE FEE ON COURTHOUSE SECURITY PER BOARD OF COUNTY COMMISSIONER | | | $ 1.50 |
| 12-11-2017 | CCADMIN04 | COURT CLERK ADMINISTRATIVE FEE ON COLLECTIONS | | | $ 0.50 |
| 12-11-2017 | LTF | LENGTHY TRIAL FUND | | | $ 10.00 |
| 12-11-2017 | TEXT | OCIS HAS AUTOMATICALLY ASSIGNED JUDGE NIGHTINGALE, REBECCA B. TO THIS CASE. | | | |
| 12-11-2017 | ACCOUNT | RECEIPT # 2017-3680244 ON 12/11/2017. PAYOR: BRYAN & TERRILL TOTAL AMOUNT PAID: $ 232.14. LINE ITEMS: CJ-2017-4900: $163.00 ON AC01 CLERK FEES. CJ-2017-4900: $6.00 ON AC23 LAW LIBRARY FEE CIVIL AND CRIMINAL. CJ-2017-4900: $1.66 ON AC31 COURT CLERK REVOLVING FUND. CJ-2017-4900: $5.00 ON AC58 OKLAHOMA COURT APPOINTED SPECIAL ADVOCATES. CJ-2017-4900: $1.55 ON AC59 COUNCIL ON JUDICIAL COMPLAINTS REVOLVING FUND. CJ-2017-4900: $7.00 ON AC64 DISPUTE MEDIATION FEES CIVIL ONLY. CJ-2017-4900: $0.45 ON AC65 STATE JUDICIAL REVOLVING FUND, INTERPRETER SVCS. CJ-2017-4900: $2.48 ON AC67 DISTRICT COURT REVOLVING FUND. CJ-2017-4900: $25.00 ON AC79 OCIS REVOLVING FUND. CJ-2017-4900: $10.00 ON AC81 LENGTHY TRIAL FUND. CJ-2017-4900: $10.00 ON AC88 SHERIFF'S SERVICE FEE FOR COURT HOUSE SECURITY. | | | |
| 03-16-2018 | CTFREE | NIGHTINGALE, REBECCA; ORDER GRANTING EX PARTE MOTION FOR SUBSTITUTION OF PARTIES ENTERED; JOHN DOE, TPD OFFICER SHOULD BE REMOVED AS A PARTY; STEPHEN TIDWELL, TPD, OFFICER SHALL BE SUBSTITUTED AS A DEFENDANT. (((ORDER PLACED IN JUDGE'S OUTBOX TO BE PICKED UP FOR FILING))) | | | |
| 03-16-2018 | MO | EX PARTE MOTION FOR SUBSTITUTION OF PARTIES / A2J Document Available (#1039843131) 📄TIFF  📄PDF | | PRINCE, WESLEY | |
| 03-19-2018 | O | ORDER / SEE ABOVE Document Available (#1039843368) 📄TIFF  📄PDF | | | |
| 05-01-2018 | SMF | SUMMONS FEE-16 | | | $ 160.00 |

| Date | Code | Description | Count | Party | Amount |
|------|------|-------------|-------|-------|--------|
| 05-01-2018 | ACCOUNT | RECEIPT # 2018-3756595 ON 05/01/2018. PAYOR: BRYAN & TERRILL LAW PLLC TOTAL AMOUNT PAID: $ 160.00. LINE ITEMS: CJ-2017-4900: $160.00 ON AC01 CLERK FEES. | | | |