# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1)　　WESLEY PRINCE,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>(2)　　TURN KEY HEALTH CLINICS, LLC,<br><br>(3)　　CITY OF TULSA,<br><br>(4)　　STEPHEN TIDWELL, in his individual capacity,<br><br>(5)　　FLINT JUNOD, in his official and individual capacities,<br><br>(6)　　JESSE WHITE, in his official and individual capacities,<br><br>(7)　　WILLIAM COOPER, in his official and individual capacities,<br><br>(8)　　JANE KIRBY, in her official and individual capacities,<br><br>(9)　　JON ECHOLS, in his official and individual capacities,<br><br>(10)　TRENT SMITH, in his official and individual capacities,<br><br>(11)　CINDY BILYEU, in her official and individual capacities,<br><br>(12)　NICOLE COBB, in her official and individual capacities,<br><br>(13)　TAMERA JACKSON, in her official and individual capacities, | Case No.: 18-CV-282-CVE-JFJ |

(14)   DANNY HICKMAN, in his official
     and individual capacities,

(15)   RHETT BURNETT, in his official
     and individual capacities,

          Defendants.

---

## FIRST AMENDED COMPLAINT

---

Plaintiff, Wesley prince, for his First Amended Complaint against Defendants City of Tulsa, Stephen Tidwell, Turn Key Health Clinics, LLC, Flint Junod, Jesse White, William Cooper, Jane Kirby, Jon Echols, Trent Smith, Cindy Bilyeu, Nicole Cobb, Tamara Jackson, Danny Hickman, and Rhett Burnett, states as follows:

## I.

### PARTIES

1.      Plaintiff, Wesley Prince ("PRINCE"), is an individual and a resident of the State of Oklahoma.

2.      Defendant Stephen Tidwell ("TIDWELL") is a police officer employed by Defendant City of Tulsa, Oklahoma ("CITY"), and at all relevant times was a resident of the State of Oklahoma.

3.      Defendant Turn Key Health Clinics, LLC ("TURN KEY") is an Oklahoma for-profit corporation. In exchange for an annual base compensation of $5,784,000 from Tulsa County taxpayers, TURN KEY contracted with the Board of County Commissioners for Tulsa County and Tulsa County Sheriff Vic Regalado to

assume their state and federal law obligation to deliver mental and medical health care ("Healthcare Services") at the David L. Moss Criminal Justice Center ("DLMCJC"). (*See* Ex. 1, Master Agreement for Comprehensive Healthcare Services ("Master Agreement")) TURN KEY generates profits for its shareholders by taking in more money for healthcare than it pays out.

4.     Upon information and belief, Flint Junod, Jesse White, William Cooper, Jane Kirby, Jon Echols, Trent Smith, Cindy Bilyeu, Nicole Cobb, Tamera Jackson, Danny Hickman, Rhett Burnett, (hereinafter referred to as "EXECUTIVES"), are or were policymaking agents or employees of TURN KEY who developed and approved TURN KEY policies or practices at issue in this matter.

5.     Defendant William Cooper ("COOPER"), was the medical provider responsible for PRINCE's medical care at the DLMCJC by means of telemedicine.

## II.

### JURISDICTION AND VENUE

6.     This Court has federal question jurisdiction over the federal law claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

7.      Plaintiff sent his tort claim notice pursuant to the Oklahoma Governmental Tort Claims Act ("OGTCA") to the City of Tulsa on April 24, 2017. Plaintiff sent his tort claim notice pursuant to the OGTCA to TURN KEY on August 10, 2017. This claim was deemed automatically denied on November 8, 2017.

8.     The acts complained of herein occurred in Tulsa County, Oklahoma, which is also the residence of one or more of the defendants.  Jurisdiction and venue are thus proper under 28 U.S.C. §§ 116(a) and 1391.

### III.

#### FACTUAL BACKGROUND

#### THE PUBLIC-PRIVATE BUSINESS MODEL

9.     TURN KEY and its EXECUTIVES have a business model that generates revenue through governmental contracts. Through these contracts, TURN KEY assumes responsibility for the government's obligation to provide Healthcare Services to people who are not free to seek out healthcare for themselves.

10.     To obtain these contracts, TURN KEY and its EXECUTIVES submit bids to government vendors. If awarded the contract, TURN KEY and the EXECUTIVES provide Healthcare Services in return for payment by the government vendor.

11.     To achieve net profits, TURN KEY and the EXECUTIVES implemented policies, procedures, customs, or practices to reduce the cost of Healthcare Services in a manner that would maintain or increase their profit margin.

12.     There are no provisions in TURN KEY's contract creating or establishing any mandatory minimum expenditure for the provision of Healthcare Services.

13.     TURN KEY's contract incentivizes cost-cutting measures in the delivery of Healthcare Services at the DLMCJC to benefit TURN KEY's investors in a manner that deprives arrestees at the DLMCJC from receiving adequate medical care.

### ARREST INCIDENT

14.     On January 9, 2017, PRINCE was employed as a laborer laying down flooring at school in Jenks, Oklahoma.

15.     At some point on the evening of January 9, 2017, PRINCE became disoriented and wandered off the job-site.

16.     Upon information and belief, PRINCE's delirium was the result of acute symptoms associated with renal failure and the onset of respiratory failure, due to pneumonia.

17.     At approximately 11:00 p.m. on January 9, 2017, PRINCE encountered an officer with the Tulsa Police Department ("TPD") who, concerned for PRINCE's obvious distress, called for an ambulance to examine PRINCE.

18.     Upon information and belief, TPD Officer TIDWELL arrived shortly thereafter and actively interfered with paramedics on scene and ready to evaluate PRINCE. Instead, TIDWELL arrested PRINCE on suspicion of public intoxication without administering any field test or permitting any evaluation by the medical providers on scene.

### ADMISSION AND TREATMENT FAILURE

19.     On January 9, 2017, PRINCE transported to the DLMCJC. He was processed into the facility at 12:10 a.m., on January 10, 2017.

20.     Approximately four hours after booking, PRINCE received an intake screening and alerted TURN KEY's intake employee of the following: (1) that he was not a drug user; (2) that he was suffering from a medical emergency; (3) and that he was in need of immediate medical assistance.

21.     The TURN KEY intake employee disregarded PRINCE's statements, his physical conditions, and obvious signs of distress, by failing to properly screen, diagnose, or treat PRINCE for his serious, life-threatening condition. This intake employee noted that PRINCE was intoxicated and potentially a danger to himself. The employee placed PRINCE on suicide watch, but failed to order any drug screen, or have PRINCE assessed by a medical doctor.

22.     Upon information and belief, the decision against ordering a drug screen for PRINCE was directly related to cost-savings practices implemented by TURN KEY and its EXECUTIVES. This practice exposed PRINCE to a substantial risk of serious harm by failing to take reasonable steps to determine the nature of PRINCE's worsening medical condition.

23.     Despite PRINCE's obvious distress, his verbal pleas for help, and the lack of objective testing or assessment by a physician to determine the nature of PRINCE's worsening medical condition, TURN KEY recommended PRINCE for general population housing on January 10, 2017 in violation of the Oklahoma Jail Standards that require close supervision of persons in need of medical care.

Case 4:18-cv-00282-CVE-JFJ   Document 20 Filed in USDC ND/OK on 06/18/18   Page 7 of 14


24.     Upon information and belief, TURN KEY's inadequate classification of PRINCE was directly caused by the failure of TURN KEY and its EXECUTIVES to provide adequate training and resources to the intake employee related to the Oklahoma Jail Standards, the NCCHC Standards, and basic constitutional duties regarding the provision of adequate medical care and supervision.

25.     At approximately 10:00 a.m. on January 10, 2017 a TURN KEY therapist made a note that PRINCE appeared to be getting more intoxicated, was unsure of where he was or how he got there, and was unable to take care of himself. Despite this note, PRINCE was not moved from general population, no drug test was administered, and no care provided.

26.     After being placed back in general population, PRINCE and other inmates at DLMCJC begged Jailers to get help for PRINCE.

27.     At approximately 6:06 p.m. on January 11, 2017, PRINCE was moved to the infirmary at DLMCJC. Despite failing to administer a drug test, TURN KEY put PRINCE on an opiate withdrawal protocol and ordered multiple medications, including benzodiazepines, blood pressure medication, and others, all despite the fact that no testing had been done, no hands-on medical care provided by a physician, and no diagnosis reached.

28.     For the next six (6) days, PRINCE's condition continued to worsen as his kidneys and lungs began shutting down. Documents indicated that PRINCE became disoriented and confused, and that he believed he was at his sister's house. No further testing or inquiry into his condition was performed by TURN KEY.

29.     On January 17, 2017, PRINCE's condition had deteriorated to a point where he was borderline unresponsive, disoriented, and having difficulty breathing.

30.     Records from St. John Medical Center ("SJMC") show that TURN KEY diagnosed PRINCE with pneumonia on January 17, 2017, and administered two (2) liters of normal saline, likely to combat PRINCE's severe dehydration. Despite this diagnosis hospital records to not memorialize any effort at the DLMCJC to initiate antibiotics prior to his arrival at SJMC.

31.     SJMC records further indicate that TURN KEY employees were well aware that PRINCE's conditions began 7 days prior to his arrival at the Emergency Department ("ED"). These records support the inference that TURN KEY had actual knowledge of PRINCE's worsening condition, but did nothing to diagnose or treat his life-threatening medical conditions.

32.     Rather than treat PRINCE for his illness at the time of his arrival on January 10, 2017, TURN KEY provided no care until PRINCE was on the verge of organ failure.

33.     Upon arrival at the SJMC ED, PRINCE was unable to give a history to the treating physician; he was disoriented and presented with slurred speech as a result of his medical condition.

34.     It was determined in the ED that PRINCE was suffering from renal and respiratory failure. He was intubated and admitted to the hospital ICU in critical condition.

35.     Due to his kidney failure, PRINCE was placed on hemodialysis at least once per day while in the ICU from January 17-January 21, 2017.

36.     Prince was moved from the ICU to a regular patient room on January 22, 2017, where he remained for another six (6) days until his discharge on January 28, 2017. PRINCE received another round of hemodialysis on January 23, 2017.

## IV.

### ABSENCE OF FEDERALISM BAR TO *MONELL* CLAIM AGAINST TURN KEY

37.     The federalism concern that compelled the *Monell* Court to erect a bar against *respondeat superior* liability for 1983 claims against municipal entities has no application here. *See e.g., Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 795 (7th Cir. 2014) ("[A] new approach may be needed for whether corporations should be insulated from *respondeat superior* liability under § 1983.").

## V.

### STATEMENT OF CLAIMS

**COUNT I**
**NEGLIGENCE**
**GTCA & COMMON LAW**
**(CITY, TURN KEY, EXECUTIVES, COOPER)**

38.     PRINCE adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

39.     CITY owed PRINCE a duty of reasonable care during the encounter on June 7, 2017. As set forth above, CITY breached that duty which caused injuries and damages to PRINCE for which the CITY is liable. Alternatively, and to the extent CITY subsequently asserts GTCA immunity, PRINCE alternatively asserts a

corresponding claim under the Oklahoma state constitution consistent with the decision in *Bosh v. Cherokee Cnty, Governmental Bldg. Auth.*, 305 P.3d 994 (Okla. 2013), 2013 OK 9.

40.     TURN KEY owed a duty of reasonable care in the diagnosis and treatment of PRINCE's medical condition consistent with its contract, the Oklahoma Jail Standards, Oklahoma common law, the ACA, and NCCHC standards. TURN KEY's employees breached that duty through the conduct detailed above, and that conduct was the direct and proximate cause of the injuries and damages suffered by PRINCE for which TURN KEY is liable.

41.     The EXECUTIVES personally participated in the enactment and enforcement of TURN KEY policies and practices at the DLMCJC with affirmative conduct exceeding the type exercised by a passive investor. The Executives owed a duty of reasonable care in the enforcement of policies that directly impacted the adequacy of care provided to inmates at the DLMCJC, including PRINCE. The Executives breached that duty by enforcing and promulgating policies and practices that were the direct and proximate cause of the injuries and damages suffered by PRINCE for which the Executives are liable.

42.     COOPER owed PRINCE and duty of reasonable care in the provision of adequate medical care at the DLMCJC, and breached that duty as described above and by failing to adequately monitor and follow PRINCE's worsening medical conditions, which directly and proximately caused injuries and damages to PRINCE for which COOPER is liable.

## COUNT II
### DELIBERATE INDIFFERENCE / CONDITIONS OF CONFINEMENT
### 42 U.S.C. § 1983
### (TIDWELL, TURN KEY AND EXECUTIVES)

43.     PRINCE adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

44.     PRINCE's condition at the time of his arrest presented an imminent threat of serious harm. PRINCE relayed this information to Tidwell, and another responding officer had already summoned emergency medical care for PRINCE, which documents subjective knowledge of the severity of PRINCE's medical condition, and further supported by verbal notice from PRINCE himself telling Tidwell the he was suffering from a serious medical condition. Despite subjective knowledge that PRINCE suffered from a serious medical condition, Tidwell acted with indifference to the consequences, and not only failed to provide access to medical care, but actively interfered with EMTs who were on scene, ready, and capable of medically assessing PRINCE in violation of 42 U.S.C. § 1983 for which Tidwell is liable.

45.     PRINCE's condition at the time of his intake and confinement at the DLMCJC presented an objectively serious risk of harm, and TURN KEY, through its agents and employees, both observed and documented his worsening condition over the course of 7 days with indifference to the consequences, and it was only when PRINCE was on the verge of organ failure that TURN KEY referred him for outside emergency medical care. The indifference exhibited by TURN KEY

11

employees violated 42 U.S.C. § 1983 for which TURN KEY is liable under a doctrine of corporate constitutional liability that recognizes the absence of the *Monell* bar supports § 1983 liability under a *respondeat superior* theory.

46.    The conditions of confinement set forth above were directly caused by practices enacted and enforced by TURN KEY, who developed them to maximize profits under a capitated contract to provide medical care at the DLMCJC. Upon information and belief, TURN KEY knew from prior incidents that its practices caused constitutional violations, and that future constitutional violations were a highly predictable or plainly obvious consequence of enforcing them. With indifference to the consequences, TURN KEY continued to enforce these practices, or took no reasonable steps to prvent them. These practices are the direct and proximate cause of the injuries and damages suffered by PRINCE for which TURN KEY is liable under 42 U.S.C. § 1983.

47.    Upon information and belief, the EXECUTIVES were personally responsible for and participated in the development and enforcement of TURN KEY practices, and upon information and belief, the EXECUTIVES knew, or strongly suspected from prior incidents, that TURN KEY's practices resulted in inadequate care, and that inadequate care caused inmates to suffer from worsening conditions over the course of their detention. Despite this knowledge, and with indifference to the consequences, the Executives continued to enforce TURN KEY practices the EXECUTIVES knew would endanger inmates like PRINCE. The practices enforced by the EXECUTIVES were the direct and proximate cause of the injuries and

damages suffered by PRINCE for which the EXECUTIVES are liable under 42 U.S.C. § 1983.

V.

RELIEF REQUESTED

WHEREFORE, Wesley Prince, respectfully requests judgment against the Defendants as follows:

A.   Actual damages against Defendants in an amount to be proved at trial;

B.   Nominal damages as a result of the Defendants' violations of Plaintiff's constitutional rights;

C.   Punitive damages as provided by law;

D.   An award of attorneys' fees and costs allowed under 42 U.S.C. § 1988(b);

E.   Interest as provided by applicable law; and

F.   Such other relief as the Court deems just and equitable.

DATED this 15th day of June, 2018.

Respectfully submitted,

BRYAN & TERRILL

*s/Hunter M. Siex*
Hunter M. Siex, OBA #33271
J. Spencer Bryan, OBA #19419
Steven J. Terrill, OBA # 20869
9 East 4th St., Suite 307
Tulsa OK 74103
Tele:  (918) 935-2777
Fax:   (918) 935-2778
hsiex@bryanterrill.com

Case 4:18-cv-00282-CVE-JFJ   Document 20 Filed in USDC ND/OK on 06/18/18   Page 14 of 14

Jsbryan@bryanterrill.com
sjterrill@bryanterrill.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2018, I electronically served the foregoing **PLAINTIFF'S FIRST AMENDED COMPLAINT** on the following persons:

Paulina Thompson
pthompson@johnsonhanan.com

Gerald M. Bender
gbender@cityoftulsa.org

Kim M. Hall
khall@tulsacounty.org

Douglas A. Wilson
douglas.wilson@tulsacounty.org

Guy A. Fortney
gfortney@brewsterlaw.com

*s/ Hunter M. Siex*
Hunter M. Siex